MELTEX, INC., Plaintiff, *v.* DAVID LIVINGSTON, Individually and as President of District 65, Retail, Wholesale and Department Store Union, C. I. O., et al., Defendants.

Supreme Court, Special Term, New York County, October 7, 1955.

*Morris J. Fellner* and *Leonard Rovins* for plaintiff.

*Irving Rosen* and *Sheldon W. Goidell* for defendants.

WALTER, J. A woolen piece goods jobber here seeks to enjoin a labor union from picketing its place of business and to recover damages for past picketing. The picketing has not been spectacular and no vast financial interests are involved. On the contrary, the case is merely a rather grim portrayal of what I suspect is typical of the impact of labor union power upon the small business man. As such, it is a case in which decision can be reached only by navigating a channel which several statutes and a myriad of judicial opinions have made narrow and to a certain extent obscure. I can only hope that my effort to pick my way through that channel will not muddy the waters for those who come after me or render the markings of the channel still more obscure.

Plaintiff, a New York corporation all the stock of which is owned by its president, who conducts its affairs, started business as a woolen piece goods jobber in 1952 in an upper floor loft at 215 West 40th Street, and moved to a small street level store at 250 West 39th Street on January 1, 1955. Its vice-president works as a salesman for it, and in May, 1955, it had in its employ a salesman, Robert Maisel, a bookkeeper, Miss Mitchell, and a delivery boy, Gaspar Guy Cruz, none of whom was a member of any union.

Defendant union, District 65, Retail, Wholesale and Department Store Union, C. I. O., has about 27,000 members in New York City, about 3,000 of whom are in the garment area. It has contracts with more than 500 establishments, including members of the Woolen Jobbers Association (of which plaintiff is not a member). About 120 of its members work for about 50 employers in the woolen jobbing industry.

In discussions had between the union and certain employers other than plaintiff in May, 1955, some employers with whom the union then had contracts complained that they were being subjected to unfair competition by nonunion competitors who paid their nonunion employees less wages than were being paid to the union employees of the then complaining employers. The union was thereby started upon what it calls an organizational drive.

Plaintiff's employees, Maisel and Cruz, were asked to join the union. Cruz joined on May 23d or 24th and his employment by plaintiff terminated on the following day. The evidence does not show that plaintiff terminated his employment because he joined the union, but Cruz and the union both believed that that was so, and Maisel at least feared that that was so and that a similar fate might befall him if he joined. The bookkeeper, Miss Mitchell, was not asked to join.

An organizer of the union urged plaintiff to rehire Cruz, telling plaintiff that the discharge well might result in a fight with the union. Plaintiff refused to rehire Cruz and the organizer told plaintiff that the union would be forced to protect Cruz in order to give courage to other employees, and that therefore the union had "no alternative but to strike."

Picketing of plaintiff's place of business by members of the union began almost immediately and was still in progress on July 15, 1955, when a Justice of this court restrained it until the hearing and determination of a motion by plaintiff for an injunction during the pendency of this action. That motion subsequently was denied.

The pickets carried large placards stating that " the employees of Meltex, Inc. are on strike. Please do not patronize." The pickets paraded in front of plaintiff's store, which has a street frontage of less than twenty feet, and sometimes asked prospective customers not to enter and sometimes followed persons who came out of plaintiff's store with the object of ascertaining where they went and who they were. The union itself appears never to have directed more than two pickets to parade at any one time, but conditions in the neighborhood of plaintiff's place of business are such that the mere presence of two pickets carrying " strike " signs was enough to cause many of the persons employed in that neighborhood to congregate in front of plaintiff's place of business, especially during the lunch hour.

The public was made aware of the fact that defendant union was picketing plaintiff's place of business, and that of itself was enough to deter some prospective customers from entering plaintiff's store, to deter some suppliers from delivering goods there, to deter some truckmen from delivering goods to plaintiff's store or delivering goods from plaintiff's store to the customers who had purchased the goods from plaintiff, to deter some spongers and other processors from processing goods for plaintiff, and even to deter some persons from coming to court to testify upon the trial, which was had nearly two months after the picketing had stopped. In short, labor union power and strength are now such that the mere fact that plaintiff was having a dispute with defendant union which caused defendant union to picket plaintiff's place of business has been enough to inflict damage upon it.

On at least one occasion Miss Mitchell was called a scab; and a member of the union, who was a shop steward in a nearby establishment, was arrested on a charge of having put liquid cement in the lock of the front door of plaintiff's store so as to make the lock unworkable. Except for those incidents there was no violence or actual disorder of any sort at any time during the picketing.

It does not necessarily follow, however, that the picketing was " peaceful ", because picketing, in order to be peaceful, must be free, not only of violence, but, also, of *any* unlawful act, i.e., free of intimidation of customers, free of any form of physical obstruction or interference with business, and free of any misrepresentation of the facts of the controversy (*Senn* v. *Tile Layers Union*, 301 U. S. 468, 479).

On June 2, 1955, the union filed with the National Labor Relations Board a charge that plaintiff was guilty of an unfair labor practice and had violated the statute in that it had fired Cruz solely because he had joined the union. On July 1, 1955, the regional director of the board decided that there was insufficient evidence of a violation and therefore further proceedings were not warranted. The union applied for a review of that decision, but on August 15, 1955, the general counsel of the board sustained the ruling of the regional director.

I do not consider whether that ruling is conclusive in the sense that it would prevent me from reaching a different conclusion, because there is nothing in the evidence before me which would warrant a different conclusion. This case, therefore, must be decided on the basis of the absence of any unfair labor practice on the part of plaintiff.

Neither do I decide whether, because of the absence of any unfair labor practice on the part of plaintiff, or because the union was not in fact a legal representative of Cruz, it was illegal for the union to urge plaintiff to rehire Cruz or to picket plaintiff's place of business as a means of securing his rehiring. For even if it be assumed that, as plaintiff contends, it would be illegal for this union to picket plaintiff's place of business solely for the purpose of getting plaintiff to rehire Cruz, the facts yet remain (1) that the union had a legitimate interest in getting plaintiff's employees to join it, in then getting them to select it as their bargaining representative, and in then getting plaintiff to make a contract which would give plaintiff's employees wages, hours, and other working conditions equal to those set forth in the contracts which other employers have made in reference to the employees of those other employers; and (2) that, although defendant Cohen emphasizes his desire to show that the union could secure the rehiring of Cruz, the real object of the picketing was to attain the ends I have just stated as ends which the union had a legitimate interest in attaining.

The further fact, of course, is that whenever a union pickets the place of business of an employer whose employees do not belong to a union it necessarily brings pressure to bear upon the employer and makes it at least likely that that employer will endeavor to relieve the pressure by doing something to get his employees to join the union which is doing the picketing. That is so even though the union loudly asserts that its sole object is to persuade the employees to join and not to coerce the

employer into coercing his employees into joining. I hence think it should be frankly realized that the picketing of the place of business of an employer whose employees do not belong to a union necessarily is an attempt to cause the employer to commit the unfair labor practice of discriminating in order to encourage or discourage membership in a labor organization (National Labor Relations Act, U. S. Code, tit. 29, § 158, subd [a], par. [3]), and hence has an illegal objective. The attempt to draw a distinction as to whether such picketing is done in order to get employees to join the union or done in order to get the employer to get his employees to join the union impresses me as wholly lacking in any reality. I can not even think of what criterion can be invoked in order to determine whether the picketing of employer A by union X is one or the other. Certainly, the criterion can not be whether the picketing does or does not cause the employer to succumb to the temptation to say to his employees " join this X union or you will be fired." Certainly, too, it would be equally inadmissible to let determination rest on whether the union's lawyer describes the object as being one or the other, or on whether some union organizer, unskilled in the accurate use of words or unconscious of the legal effect of his words, says " we are picketing in order to get the employees of A to join our union " or " we are picketing in order to make A tell his employees to join our union or get fired."

Nevertheless, the distinction which I think lacks reality is being drawn (see FULD, J., in *Wood* v. *O'Grady,* 307 N. Y. 532, 542). Solely because of that, I will not decide this case on the basis that the picketing here was for an unlawful objective. I will assume, on the contrary, that the picketing here was solely for the entirely legitimate purpose of advancing the entirely legitimate labor objective of getting more people to join the union and more employers to hire only union members and pay them union wages.

On that assumption I reach the question whether the picketing was a lawful means for attaining that lawful end. That is, whether now powerful labor unions lawfully may still further aggrandize themselves at the expense of the right of another person to carry on a legitimate business.

A priori I would think that the answer to that question must be clearly and unhesitatingly *no.*

" Rights are never absolute and independent of those of others." (*O'Neill* v. *City of Port Jervis,* 253 N. Y. 423, 430; *Aikens* v. *Wisconsin,* 195 U. S. 194, 205, 206.) All rights must

be exercised in subordination of the rights of others. The right of one person to do an act necessarily ends at the point where it meets with another person's right that the act be not done. *Sic utere tuo ut alienum non lædas* expresses a fundamental principle of the common law " one cannot use his own property so as to injure the rights of others " (*People v. New York Carbonic Acid Gas Co.*, 196 N. Y. 421, 440). Labor unions, like every one else, must let live as well as live. Even the sacred right to strike is not absolute and may not be availed of as a means of coercing an employer to pay a disputed State claim (*Dorchy v. Kansas*, 272 U. S. 306, cited in *Goodwins, Inc.*, v. *Hagedorn*, 303 N. Y. 300, 305). The constitutional right of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic (*Schenck v. United States*, 249 U. S. 47, 52). It does not even protect a man from an injunction against uttering words that may have all the effect of force (*Schenck v. United States, supra,* citing *Gompers v. Bucks Stove & Range Co.*, 221 U. S. 418, 439).

Those general principles seem to me enough to show that the answer to the question I have last above stated must be *no*. But shibboleths and bromides about peaceful picketing and free speech have been sprinkled around in too many judicial opinions for me to give that answer upon the basis of those general principles alone without first examining as to what has been actually decided.

To the extent that picketing is a dissemination of ideas — a publicizing of the fact that a dispute of some sort exists between the picketer and the picketed, and a plea to the public that it side with the picketer — it is an exercise of the constitutional right of free speech which the States cannot penalize as a crime (*Thornhill v. Alabama*, 310 U. S. 88; *Carlson v. California*, 310 U. S. 106) or enjoin upon the mere ground that the dispute being publicized is not a dispute between the person picketed and his own employees (*American Federation of Labor v. Swing*, 312 U. S. 321; *Cafeteria Union v. Angelos*, 320 U. S. 293, revg. *Angelos v. Mesevich*, 289 N. Y. 498).

But picketing is also something more than and different from free speech, something more than and different from a mere dissemination of ideas, or a publicizing of facts, or a bid for support of the side of the picketer. It is intended to exert, and usually does exert, influences, and induce action quite apart from the nature of the ideas being disseminated, and those aspects of it make it the subject of regulation (*Bakery Drivers Local v. Wohl*, 315 U. S. 769, 776, 777; *Hughes v. Superior*

*Court,* 339 U. S. 460, 464, 465; *Mayer Bros. Poultry Farms* v. *Meltzer,* 274 App. Div. 169, 179).

In fact, it has now come to be judicially recognized that picketing is, or at least may be, a form of economic pressure, that many people refuse to cross a picket line, and that picketing thus may be intimidating, coercive and oppressive even though it is orderly and free from violence or disorder (*Carpenters Union* v. *Ritter's Cafe,* 315 U. S. 722; *Mayer Bros. Poultry Farms* v. *Meltzer,* 274 App. Div. 169, 180, *supra*; *Hughes* v. *Superior Court,* 339 U. S. 460, 464, *supra*; *Wood* v. *O'Grady,* 307 N. Y. 532, 547, *supra*; *Goodwins, Inc.,* v. *Hagedorn,* 303 N. Y. 300, 305, *supra*; *Garner* v. *Teamsters Union,* 346 U. S. 485, 487).

It is not beyond the control of the State if *the manner in which it is conducted or the purpose which it seeks to effectuate* gives ground for its disallowance (*Hughes* v. *Superior Court,* 339 U. S. 460, 465, 466, *supra*).

A State is not required to tolerate it in all places and under all circumstances, even though it be peaceful in the sense that it is not accompanied by physical violence or disorder (*Hughes* v. *Superior Court,* 339 U. S. 460, 466, *supra*).

Picketing accompanied by violence of course may be enjoined (*Hotel Employees' Local* v. *Board,* 315 U. S. 437), and so, also, may picketing which has become peaceful but which still operates coercively because it excites a fear that violence may be resumed (*Drivers Union* v. *Meadowmoor Co.,* 312 U. S. 287).

A State may enjoin picketing carried on for the sole purpose of inducing the person picketed to agree not to sell ice to non-union peddlers (*Giboney* v. *Empire Storage Co.,* 336 U. S. 490); and as the union's purpose in endeavoring to get such agreement was to improve hours, wages, and other working conditions, and thus was a lawful labor objective, that case stands for the proposition that a State may hold picketing to be an unlawful means of obtaining a lawful end and enjoin it for that reason.

A State may prevent a union from picketing a restaurant for the purpose of inducing one who had contracted to build a house for the owner of the restaurant to employ union painters and carpenters (*Carpenters Union* v. *Ritter's Cafe,* 315 U. S. 722, *supra*); and as getting employment for union members is of course a lawful union objective, that case also stands for the proposition that a State may limit the means by which lawful union objectives may be obtained, and, in so doing, may enjoin picketing.

A State may enjoin the picketing of one who carries on his business without employees even though the union's purpose is to secure that person's compliance with its demand that he become a union shop (*Teamsters Union* v. *Hanke,* 339 U. S. 470); and as that holding was made in the face of the court's specific statement that the union obviously was concerned not to have union standards undermined by nonunion shops and that that interest penetrates into self-employer shops (*supra,* p. 475), that case also necessarily stands for the proposition that even so-called organizational picketing (picketing carried on for the purpose of unionizing a shop) may be restrained by a State if the State sees fit to do so.

A State may make it unlawful for employers to coerce their employees' choice of representatives for purposes of collective bargaining, and a State which does so may enjoin even intermittent and nonviolent picketing carried on for the purpose of getting an employer to sign a contract requiring his employees to join the picketing union (*Building Service Union* v. *Gazzam,* 339 U. S. 532). As the obtaining of such a contract obviously is a lawful union objective, that case, also, stands for the proposition that a State may enjoin picketing as an unlawful means of obtaining a lawful end.

A New York injunction against picketing in order to induce bakery peddlers to work only six days a week and to hire a union member one day a week (*Wohl* v. *Bakery & Pastry Drivers Union,* 284 N. Y. 788) was reversed in *Bakery & Pastry Drivers Local* v. *Wohl* (313 U. S. 548; 315 U. S. 769) but the Supreme Court there specifically stated (p. 775) that there were no circumstances from which it could be inferred that the picketing was or was likely to be " attended by violence, force or coercion, or conduct otherwise unlawful or oppressive "; and the Supreme Court's decision thus does not stand for the proposition that nonviolent picketing may not be enjoined but rather for the converse proposition that it may be enjoined if it be violent, coercive or oppressive or otherwise unlawful under State law.

A State's refusal to enjoin picketing which, although orderly, caused loss to the picketed concern because drivers for other carriers refused to cross picket lines was affirmed in *Garner* v. *Teamsters Union* (346 U. S. 485, *supra*), but neither the refusal nor the affirmance was placed upon the ground that conduct of that sort was lawful, or upon the ground that the State could not constitutionally prohibit it, but upon the ground that the grievance of the picketed carrier was within the jurisdiction of

the National Labor Relations Board and for that reason State action was prohibited.

*Weber* v. *Anheuser-Busch* (348 U. S. 468) likewise holds only that State jurisdiction of the dispute there involved was ousted because it fell within the jurisdiction of the National Labor Relations Board; and the same thing is true of *General Drivers Union* v. *American Tobacco Co.* (348 U. S. 978).

I thus find nothing in any decision of the United States Supreme Court which supports the idea that New York is constitutionally prohibited from taking the view that picketing which is in fact coercive and oppressive and causes actual harm is unlawful even though pursued without disorder and for an entirely lawful labor objective. On the contrary, that court, in no less than three cases, has held, specifically and expressly, that a State may hold picketing to be an unlawful means for obtaining a lawful labor objective and enjoin it for that reason (*Giboney* v. *Empire Storage Co.*, 336 U. S. 490, *supra*; *Carpenters Union* v. *Ritter's Cafe*, 315 U. S. 722, *supra*; *Building Service Union* v. *Gazzam*, 339 U. S. 532, *supra*). In still another case, that court has made the specific ruling that a State may restrain organizational picketing (*Teamsters Union* v. *Hanke*, 339 U. S. 470, *supra*). And in the latest case in that court, which has been called to my attention, it was held that a State constitutionally may enjoin peaceful picketing carried on for purposes in conflict with a State statute declaring that a contract limiting employment to union members is against public policy (*Plumbers Union* v. *Graham*, 345 U. S. 192).

Of *Senn* v. *Tile Layers Union* (301 U. S. 468, *supra*) it is important to observe that it holds merely that a State constitutionally may authorize the picketing of a small tile layer in order to get him to sign an agreement which would prevent him from doing some of his own work; and that is a long way from holding that a State must or should authorize such a thing.

I think it appropriate to note, also: Congress, of course, cannot restrict free speech any more than a State can (*Thornhill* v. *Alabama*, 310 U. S. 88, 95, *supra*). Yet Congress, since the *Thornhill* (*supra*), *Carlson* (310 U. S. 106, *supra*), and *Swing* (312 U. S. 321, *supra*) cases were decided, has enacted that it is unlawful to attempt to coerce the holder of a radio broadcasting license to employ in the conduct of his business more employees than are needed (U. S. Code, tit. 47, § 506); and the constitutionality of that statute has been sustained (*United States* v. *Petrillo*, 332 U. S. 1).

It thus appears to me to be settled that New York constitutionally can take the view that picketing which is in fact coercive or oppressive and causes harm is unlawful, and may be enjoined, even though pursued without physical disorder and for an object which it is lawful for a labor union to pursue. The view, in other words, is that picketing which is coercive is unlawful and the fact that it is done in order to further legitimate labor objectives does not constitute legal justification for it.

I now turn, therefore, to the New York decisions in order to find out whether New York has so far rejected that view that I am now precluded from taking it.

The opinion in *Goodwins, Inc.*, v. *Hagedorn* (303 N. Y. 300, 305, *supra*) declares succinctly and flatly, "In short, the defendant union is subjecting the plaintiff employers to economic pressure and is thereby injuring their business without justification in law. Coercion of that kind is clearly unlawful (*Dorchy* v. *Kansas*, 272 U. S. 306, 311) and in our judgment can be enjoined by the courts of this State."

In many other New York cases also it has been laid down generally and broadly that the means used as well as the end sought must be lawful, that picketing may not be accompanied by violence, trespass, threats or intimidation, that no crowds may be collected on or near the employer's property, that the free entrance of strangers, customers or employees may not be impeded, that there may be no threats, no statements false in fact yet tending to injure the employer's business (*Exchange Bakery & Restaurant* v. *Rifkin*, 245 N. Y. 260; *J. H. & S. Theatres* v. *Fay*, 260 N. Y. 315), that customers or employees may not be annoyed or accosted (*Wise Shoe Co.* v. *Lowenthal*, 266 N. Y. 264); that the picketing must not be coercive or accompanied by acts of intimidation or false representations that a labor dispute exists or that the picketed person's employees are out on strike or that such person is unfair to organized labor (*Florsheim Shoe Store Co.* v. *Retail Shoe Salesmen's Union*, 288 N. Y. 188, 201; *La Manna* v. *O'Grady*, 278 App. Div. 77). (See, also, *Wilner* v. *Bless*, 243 N. Y. 544; *Nann* v. *Raimist*, 255 N. Y. 307; *Steinkritz Amusement Corp.* v. *Kaplan*, 257 N. Y. 294, and *Busch Jewelry Co.* v. *United Retail Employees' Union*, 281 N. Y. 150.)

Picketing with false and misleading signs has been enjoined (*Dubrow Pure Food* v. *Glazel*, 239 App. Div. 844, affd. 263 N. Y. 589); and *Amazon* v. *Local 178* (135 N. Y. S. 2d 27) asserts that there is a point where labor's right to picket peacefully for a lawful purpose collides with the right to engage in free enter-

prise, and an injunction was there granted. (See, also, *Arnold Bakers* v. *Strauss,* 207 Misc. 752, and *Dalzell Towing Co.* v. *United Marine Division,* 279 App. Div. 212; 124 N. Y. S. 2d 70, affd. 281 App. Div. 968.)

Defendants assert that all that has been overruled, repudiated, and rendered obsolete by *Wood* v. *O'Grady* (307 N. Y. 532). I do not agree. That four to three reversal of the Appellate Division doubtless came as a surprise, but the surprise was as to the manner in which the majority viewed the evidence and the facts, rather than at the announcement of a new rule which overruled prior decisions. The majority thought that the picketing there caused the employer only personal inconvenience and not substantial and irreparable injury. It thought that plaintiff himself had attempted to coerce his own employees in a way which was sufficient in itself to warrant a denial of an injunction; and it thought that the signs carried by the pickets spoke only the truth.

In my view, therefore, the law of New York since *Wood* v. *O'Grady* is the same as it was before that decision, viz.: that picketing which is accompanied by threats, intimidation, coercion, or false representations, or annoyance to customers or employees is unlawful even though carried on by a labor union as a means of furthering a lawful labor objective.

There possibly may be room for argument that labor decisions of the United States Supreme Court have overruled *Goodwins, Inc.,* v. *Hagedorn* (303 N. Y. 300, *supra*) on the question of State jurisdiction where practices defined by Federal statutes as constituting unfair labor practices are concerned, but there is no room for argument as to the present soundness of its enunciation that the law of New York is that subjecting an employer to the economic pressure of picketing his place of business is unlawful coercion if done without justification in law.

Massachusetts takes the view that picketing in order to get the person picketed to conform to union standards is unlawful and may be enjoined (*Saveall* v. *Demers,* 322 Mass. 70; *Colonial Press* v. *Ellis,* 321 Mass. 495).

The picketing here was coercive, oppressive, threatening and intimidating. It also was accompanied by false representations. The statement that the employees of plaintiff were on strike was not a mere exuberance or innocent statement. The employees of plaintiff were *not* on strike, and the statement that they were entirely false and known to be false, and was made deliberately for the purpose of gaining an advantage. A part of the learning of every union organizer is that there is a right

to strike, and the word "strike" undoubtedly was adopted in this instance in an attempt to give the picketing an aurora of legality. There are many persons who, if told that the employees of a certain employer are on strike will conclude that such employees have a real grievance and sympathize with them accordingly, but who, if told that an employer's place of business is being picketed as a means of getting his employees to join the union or of getting that employer to unionize his shop, will feel that labor unions are too powerful already and sympathize with the employer who is being picketed. In fact, if the placards carried by the pickets in this case had told the truth the probabilities are that the damage and injury to plaintiff would have been less; but the union selected the placards and must bear the consequences of its own acts.

If the question in this case were whether the acts complained of constituted an act prohibited by a Federal statute or an act which was an exercise of a right conferred by a Federal statute, it well might be that this court would have no jurisdiction (cases cited in *Freydberg, Inc.,* v. *International Ladies Garment Workers Union,* 128 N. Y. S. 2d 470). But as the question here, as I am viewing the case, is whether, as a matter of New York State law, pursuit of a legitimate labor objective is a legal justification for injuring another by subjecting him to the economic pressure of coercive and misleading picketing, State jurisdiction is clear beyond controversy.

Defendants assert that because the picketing has ceased an injunction would be improper. Doubtless that ordinarily would be so. Here, however, defendants decline to say that picketing will not be resumed if an injunction is refused. They go no further than to say that the union has not yet decided what its course will be if the complaint here is dismissed; and from that alone I can draw the inference that refusal of an injunction will be simply a signal for renewal.

Furthermore, although the picketing itself has ceased, its coercive effect still persists. Spongers, truckmen and other people still refuse to do business with plaintiff because they want nothing to do with any one who is having a controversy with a labor union, and so far as I can see the only way of removing that still persisting effect of the coercion flowing from the picketing is the rendition of such a decision as will make the spongers and truckmen and others feel that Meltex' controversy with the union is over and now they safely can do business with it again.

Defendants claim that the case involves or grows out of a "labor dispute" within the meaning of section 876-a of the

Civil Practice Act, and hence no injunction can be granted except within the terms of that statute. It is settled, however, that where the object sought by the union is not a lawful labor objective, section 876-a does not apply (*Opera on Tour* v. *Weber,* 285 N. Y. 348; *American Guild of Musical Artists* v. *Petrillo,* 286 N. Y. 226, 231; *Goodwins, Inc.,* v. *Hagedorn,* 303 N. Y. 300, 305, *supra*); and I am inclined to think that it must be equally true that where, as here, unlawful means for obtaining a lawful labor objective are used and are sought to be enjoined, there is no " labor dispute " and section 876-a does not apply. But instead of definitely deciding that point I merely make the following specific findings which justify an injunction even if section 876-a be deemed applicable: (a) Unlawful acts have been threatened and committed and will be continued unless restrained; (b) Substantial and irreparable injury to plaintiff's property will follow unless the requested relief is granted to the extent here indicated; (c) As to each item of relief granted, greater injury will be inflicted upon plaintiff by the denial thereof than will be inflicted upon defendant by the granting thereof; (d) Plaintiff has no adequate remedy at law; (e) The public officers charged with the duty to protect plaintiff's property have failed and are unable to furnish adequate protection — not because the police of the City of New York are inefficient, but because the people who refuse to deal with plaintiff because it is engaged in a controversy with a labor union can not be compelled or persuaded by policemen to deal with plaintiff despite the fact that plaintiff is so engaged, and the only effective way of persuading them to deal with plaintiff is the rendition of a judicial decision terminating the controversy in plaintiff's favor.

I hence conclude that plaintiff is entitled to judgment enjoining defendants from maintaining any picket line in front of or picketing plaintiff's place of business, from molesting, accosting, following, intimidating, or interfering with plaintiff's employees or customers or prospective customers or other persons desiring, seeking, or intending to do business with plaintiff, and from in any way asserting that there is a dispute between plaintiff and its employees or between plaintiff and defendant union or that plaintiff's employees are on strike or that plaintiff is unfair to organized labor. The injunction so ordered is permanent in the sense that it finally adjudicates this action, but it of course does not adjudicate any dispute which may hereafter arise and is not to be taken or construed as enjoining a strike or picketing by reason of any subsequent dispute if some subse-

quent dispute should hereafter arise. If either party shall hereafter claim that some subsequent dispute justifying an assertion of the existence of a dispute or of picketing by reason thereof has arisen, application should be made to this court for a declaration as to whether the trouble which hereafter arises is in fact a new dispute or merely an assertion of the existence of a dispute in violation of the injunction herein.

The final question is whether or not plaintiff is entitled to money damages for such injuries as it has sustained. The evidence leaves no doubt that damage has been sustained, and damages have been awarded against labor unions for similar wrongs in the past (*Lawlor* v. *Loewe,* 209 F. 721, affd. 235 U. S. 522). But my understanding of *Martin* v. *Curran* (303 N. Y. 276) and *Brown* v. *Hibbets* (290 N. Y. 459, 467) is that under the law of New York damages cannot be recovered against a labor union in an action brought only against its officers. For that reason I do not undertake to determine exactly what amount of damage has here been proved, and as to the claim for damages the complaint is dismissed without prejudice to the bringing of a new action in such form as will warrant a judgment against the union for such damage as plaintiff can prove in such new action.

During the pendency of the action plaintiff moved to punish for contempt because of an alleged violation of the temporary restraining clause contained in the order to show cause for an injunction *pendente lite,* and that motion was referred to the Trial Justice. The evidence fails to establish any contempt and that motion is denied.

Plaintiff will recover one bill of taxable costs.

I direct the entry of judgment in accordance herewith.

The foregoing constitutes the decision required by the Civil Practice Act and judgment is to be entered thereon.